UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - X

ORANGE COUNTY CHOPPERS, INC., a New      :      06 Civ. 7211 (WCC)
York Corporation,

                                         :               **ECF CASE**

          Plaintiff-Counterdefendant,

                                         :

          - against -

                                         :

OLAES ENTERPRISES, INC. d/b/a ODM, a             **OPINION**
California Corporation,                   :      <u>AND ORDER</u>

          Defendant-Counterplaintiff,    :

          - against -                     :

VENDING SUPPLY, INC., a Nevada Corpora- :
tion, and INTERBRAND LLC, a Delaware
limited liability corporation,           :

          Additional Counterdefendants. :

- - - - - - - - - - - - - - - - - - - - - X

**A P P E A R A N C E S :**

                              TABNER, RYAN AND KENIRY, LLP
                              **Attorneys for Plaintiff-**
                                **Counterdefendant Orange County**
                                **Choppers, Inc.**
                              18 Corporate Woods Boulevard
                              Albany, New York 12211

WILLIAM J. KENIRY, ESQ.
BENJAMIN F. NEIDL, ESQ.

          Of Counsel

                              BLEAKLEY PLATT & SCHMIDT, LLP
                              One North Lexington Avenue
                              White Plains, NY 10601

THOMAS G. BAILEY, JR., ESQ.

          Of Counsel                    - and -

                              **Copies E-Mailed to Counsel of Record**

**A P P E A R A N C E S :   (continued)**

                                    LAW OFFICES OF DARREN J. QUINN
                                    12702 Via Cortina, Suite 105
                                    Del Mar, CA 92014

DARREN J. QUINN, ESQ.

        Of Counsel                  **Attorneys for Defendant-
                                      Counterplaintiff Olaes
                                      Enterprises, Inc. d/b/a ODM**


                                    MARSH MENKEN & WEINGARDEN PLLC
                                    **Attorneys for Additional
                                      Counterdefendant Vending Supply,
                                      Inc.**
                                    81 Main Street, Suite 305
                                    White Plains, New York 10601

MITCHELL I. WEINGARDEN, ESQ.
DAVID A. MENKEN, ESQ.

        Of Counsel


                                    MARKOTSIS & LIEBERMAN
                                    **Attorneys for Additional
                                      Counterdefendant Interbrand, LLC**
                                    183 Broadway, Suite 210
                                    Hicksville, New York 11801

DOUGLAS M. LIEBERMAN, ESQ.

        Of Counsel

**CONNER, Sr. D.J.:**

Plaintiff Orange County Choppers, Inc. ("OCC")[1] brings this action against Olaes Enterprises, Inc. d/b/a ODM ("ODM")[2] for breach of contract and unjust enrichment. OCC and ODM entered into a licensing agreement pursuant to which ODM agreed to pay royalties to OCC in return for a license to use OCC's trade name and trademarks in designing T-shirts and other apparel. OCC alleges that ODM breached the license agreement by failing to pay $846,723.99 in royalties due under the contract. ODM, in turn, brings copyright infringement claims against OCC, Vending Supply, Inc. ("VSI")[3] and Interbrand LCC,[4] pursuant to 17 U.S.C. §§ 101, *et seq.*, alleging that they marketed and sold designs on which ODM owns copyrights. In addition, ODM asserts a litany of counterclaims against OCC for breach of contract, unjust enrichment, unfair competition, breach of the implied covenant of good faith and fair dealing and tortious interference with contractual relations. OCC, VSI and Interbrand now move pursuant to FED. R. CIV. P. 12(b)(6) for dismissal of all but one of ODM's claims. For the following reasons, their motion is granted in part and denied in part.

---

[1] OCC is a manufacturer of customized motorcycles and is a New York State corporation with its principal place of business in the Village of Montgomery, County of Orange, New York. (*See* Complt. ¶ 1; Counterclaims ¶ 2.)

[2] ODM, a graphic design company, is a California corporation with its principal place of business in the County of San Diego, California. (*See* Complt. ¶ 3; Counterclaims ¶ 1.)

[3] VSI, a Nevada corporation with it principal place of business in Nevada, manufactures, markets and sells tattoo designs and stickers. (*See* Counterclaims ¶ 3.)

[4] Interbrand appears to be in the business of brand design and is a Delaware limited liability company located in New York and/or Pennsylvania. (*See* Counterclaims ¶ 4.)

1

**BACKGROUND**

The following facts are taken from ODM's Counterclaims and the relevant provisions of the licensing agreement between the parties.[5]  OCC is a well-known custom motorcycle manufacturer and is featured on "American Choppers," a reality television show on the Discovery Channel.  It also sells apparel featuring its trade name and logos, including T-shirts, hats, sweatshirts and sun glasses. (*See* Complt.; http://orangecountychoppers.com.)  ODM is a graphic design company that creates, markets and sells graphic designs and artwork incorporating companies' trade names and trademarks in accordance with various licensing agreements.  (*See* Counterclaims ¶ 6.)  It has worked with hundreds of licensors, including companies such as General Motors and Corona Beer.  (*See id.*)

**I.     The Consumer Product License Agreement**

On March 1, 2003, OCC and ODM entered into the "Consumers Product License Agreement" (the "Agreement").  The Agreement granted ODM the exclusive right and license to use OCC's logos, trademarks and controlled designs (hereinafter, the "OCC Property") in connection with the manufacture, distribution, sale and advertising of T-shirts, fleeces, jerseys, caps and beanies (hereinafter, the "Licensed Products").[6]  (*See* Neidl Aff'm, Ex. A (Agreement ¶¶ 1(l), (r), 2(a)(i)).)  In return, ODM agreed to pay OCC royalties in the amount of eight or ten percent of the net sales price on all products sold featuring OCC Property.[7]   (*See id.* (Agreement ¶ 4).)  The Agreement

---

[5] *See infra* pp. 8-9.

[6] Effective August 15, 2004, the parties amended the Agreement to exclude the manufacture, distribution, sale and advertising of caps and beanies.  (*See* Neidl Aff'm, Ex. B.)

[7] ODM agreed to pay eight percent of the net sales price on all "mass market and lower" sales and ten percent of the net sales price on all other sales.  (*See id.* (Agreement ¶ 4(b)(i)).)

became effective on April 1, 2003 and expired on December 31, 2005.  (*See id.* (Agreement ¶ 3).)

### A.  <u>Approval of Designs</u>

The Agreement provided OCC the right to approve all designs proposed by ODM prior to distribution.  (*See id.* (Agreement, Standard Terms and Conditions, ¶ A(2)(d)).)  Specifically, OCC could disapprove a proposed design if, "in its sole and unfettered discretion," it would "impair the value and goodwill" of OCC Property.  (*See id.*)  Moreover, OCC had the right to disapprove a proposed design for any "reasonable cause," including if it did not satisfy the general quality standards of OCC, failed to accurately depict OCC Property, was unethical, immoral or offensive to good taste, or failed to carry proper copyright, trademark or other required notices.  (*See id.*)  OCC was required "to use reasonable efforts to notify [ODM] in writing of its approval or disapproval of any materials submitted to it . . . within fifteen [] days after its receipt of such materials, and . . . in the case of its disapproval, to notify [ODM] in writing of its reasons for disapproval."  (*See id.* ¶ (A(2)(e)).)  "In the event [OCC] fail[ed] to approve or disapprove of any materials submitted . . . within twenty [] days after [its] receipt of such materials . . ., the materials [were] automatically deemed disapproved."  (*See id.*)

### B.  <u>Duty to Provide Royalty Statements</u>

Pursuant to the Agreement, ODM was obligated to furnish a royalty statement within thirty days after the close of each month along with the royalty payments then due.[8]  (*See* Neidl Aff'm, Ex.

---

[8] The original contract called for quarterly royalty statements and corresponding payments, but was subsequently amended to require monthly statements.  (*See* Neidl Aff'm, Ex. B.)

3

A (Agreement, Standard Terms and Conditions, ¶ C(5)), Ex. B.)  Specifically, the Agreement

provided:

> [ODM] shall furnish to [OCC] . . . a full and complete statement, duly certified by
> an officer of [ODM] to be true and accurate, showing the number of each type of
> Licensed Product sold during the calendar [month] in question, the total gross sales
> revenues for each such Licensed Product, an itemization of all allowable deductions,
> if any, the Net Sales Price for each Licensed Product sold and the amount of royalties
> due with respect to such sales together with such other pertinent information as
> [OCC] may reasonably request from time to time.
> . . .
> [ODM] will keep accuarate books of account and records covering all transactions
> relating to the rights and licenses granted under this Agreement including sales of
> Licensed Products[] . . . .

(*See id.*, Ex. A (Agreement, Standard Terms and Conditions,  ¶¶ C(5), C(8)).)  The Agreement

further provided that "[t]he receipt or acceptance by [OCC] . . . of any royalty statements furnished

pursuant to this Agreement, or the receipt or acceptance of any royalty payments made, shall not

preclude [OCC] from questioning their accuracy at any time."  (*See id.* (¶ C(6)).)


### C.    **Trademark and Copyright Rights**

The  Agreement  also  contained  separate  sections  entitled  "Trademark  Protection"  and

"Copyright Provisions" that governed the intellectual property rights of the respective parties.  (*See

id.* (¶¶ D(1), E).)  The trademark section, in particular, provided that "[a]ll uses of the [OCC]

Property [by ODM] will inure to the exclusive benefit of [OCC], which will own all rights, including

trademark rights, created by such uses of the Property, together with the goodwill of the business in

connection with  which  such  trademarks  are  used."  (*See id.* (¶ D(1)).)  The copyright section

provided:

> [OCC] and [ODM] acknowledge and agree that to the extent that [ODM's] graphic

designs, including, but not limited to, the creative elements contained therein can be separated from [OCC's] Property, [ODM] shall retain ownership of the graphic designs and/or creative elements; however, if such graphic designs created by [ODM] cannot be separated from [OCC's] Property, [OCC] shall own the graphic designs.

(*See id.* (¶ E).)

## II.    The Parties' Allegations

On August 10, 2006, OCC filed an action in New York State Supreme Court and alleged that ODM underpaid royalties due under the Agreement in the amount of $846,723.99. (*See* Complt. "Wherefore.")  ODM removed the action to federal court and asserted fourteen counterclaims, thirteen of which OCC now moves to dismiss.[9]

### A.    OCC's Alleged Unauthorized Distribution of the Designs to VSI, Interbrand and Other OCC Licensees

First, ODM alleges that it owns copyrights in the various designs that it created pursuant to the Agreement and that OCC infringed these copyrights by providing ODM's designs to other OCC licensees, including VSI and Interbrand, without its permission.  (*See* Counterclaims ¶ 17.) Specifically, ODM claims that OCC provided ODM's designs to approximately fifty of OCC's licensees, which then advertised or sold merchandise containing designs that were substantially similar to those owned by ODM. (*See id.* ¶¶ 18-19.)  Attached as exhibits to ODM's Counterclaims are advertisements for VSI and Interbrand merchandise featuring the designs created by ODM. (*See id.*, Exs. B, C.)

---

[9] The only claim that OCC does not move to dismiss is Count Seven for breach of contract alleging that OCC licensed other entities to use the OCC Property in violation of the Agreement's exclusivity provision.  (*See* Counterclaims ¶¶ 52-56.)

5

**B.    OCC's Alleged Breach of the Agreement's Exclusivity Provision**

Second, ODM asserts claims for breach of contract, unjust enrichment and unfair competition against OCC, alleging that it licensed other entities to use the OCC logos, trademarks and other controlled designs in connection with the manufacture, distribution sale and advertisement of the Licensed Products (*i.e.*, T-shirts, fleeces and jerseys) in violation of the Agreement's exclusivity provision.  (*See* Counterclaims ¶¶ 52-56; Neidl Aff'm, Ex. A (Agreement ¶ 2(a)(i)).)  It claims that "[b]y double- and triple-licensing to produce Licensed Products as defined in the [] Agreement, OCC took a property right belonging to ODM and used ODM's property for its own commercial advantage."  (*See* Counterclaims ¶ 62.)

**C.    OCC's Alleged Withholdings of Design Approval**

Third, ODM alleges that OCC intentionally delayed its approval of ODM's designs in violation of ¶ A(2)(e) of the Standard Terms and Conditions of the Agreement.  (*See id.* ¶¶ 65-75.)  It claims that "OCC breached its contractual obligations under the [] Agreement by failing to use 'reasonable efforts' to approve or disapprove ODM's designs with fifteen days after receipt of such materials[,]" but rather, "delayed approval . . . to force renegotiation of the [] Agreement in order to try to obtain more money and concessions from ODM than the parties had agreed to."  (*See id.* ¶¶ 70, 71.)  In particular, ODM alleges that it "was coerced into signing three amendments to the [] Agreement to limit the scope of ODM's license with OCC and to agree to various other concessions in exchange for OCC's approval of its designs."  (*See id.* ¶ 71.)  Furthermore, according to ODM's allegations, "when [it] refused to sign other amendments to the [] Agreement to carve out exceptions to its exclusive license rights, OCC's authorized Agent threatened to hold back approvals and to

make certain that ODM's agreement with OCC would not be renewed." (*See id.* ¶ 72.)


### D.    Overpayment of Royalties

Fourth, ODM asserts claims for breach of contract and unjust enrichment against OCC, alleging that it mistakenly overpaid royalties to OCC and that OCC has refused to return the monies. (*See id.* ¶¶ 80-89.) Specifically, ODM alleges that it inadvertently failed to characterize certain sales to J.C. Penney and other retailers as "mass market" and, as a result, mistakenly paid ten percent royalties on those sales, instead of the proper rate of eight percent. (*See id.* ¶¶ 83-84.) *See supra* n.7.


### E.    OCC's Alleged Interference with ODM's Contract With Discovery

Finally, ODM claims that OCC tortiously interfered with its contract with Discovery Licensing, Inc. ("Discovery"). (*See id.* ¶¶ 90-96.) It alleges that it entered into a valid and binding license agreement with Discovery in connection with the manufacture, promotion, advertisement, sale and distribution of apparel featuring the brand name "American Choppers." (*See id.* ¶ 91.) According to ODM, "OCC threatened Discovery that it would pull out of the 'American Choppers' television show unless Discovery terminated the Discovery Agreement with ODM." (*See id.* ¶ 94.)


## DISCUSSION

### I.    Legal Standard

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all of the well-pleaded facts as true and consider those facts in the light most favorable to the non-moving party. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Hertz Corp. v. City of New York*, 1 F.3d

121, 125 (2d Cir. 1993); *In re AES Corp. Sec. Litig.*, 825 F. Supp. 578, 583 (S.D.N.Y. 1993) (Conner, J.). On such a motion, the issue is "whether the claimant is entitled to offer evidence to support the claims." *Scheuer*, 416 U.S. at 236. A complaint should not be dismissed for failure to state a claim "'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Padavan v. United States*, 82 F.3d 23, 26 (2d Cir. 1996) (quoting *Hughes v. Rowe*, 449 U.S. 5, 10 (1980)). However, allegations that are so conclusory that they fail to give notice of the basic events and circumstances of which the plaintiff complains, are insufficient as a matter of law. *See Martin v. N.Y. State Dep't of Mental Hygiene*, 588 F.2d 371, 372 (2d Cir. 1978).

In assessing the legal sufficiency of a claim, the Court may consider those documents that are "integral" to plaintiff's claims, even if not explicitly incorporated by reference. *See, e.g.*, *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006). It is permissible, for example, to consider documents that are attached, referenced, quoted or relied upon in the pleadings. *See id.*; *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808-09 (2d Cir. 1996); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 46-48 (2d Cir. 1991); *Smart v. Goord*, 441 F. Supp. 2d 631, 637 (S.D.N.Y. 2006); *Garcia v. Lewis*, No. 05 Civ. 1153, 2005 WL 1423253, at *3 (S.D.N.Y. June 16, 2005); *U.S. Fid. & Guar. Co. v. Petroleo Brasileiro S.A.-Petrobras*, No. 98 Civ. 3099, 2001 WL 300735, at *2 (S.D.N.Y. Mar. 27, 2001). In the present case, the parties extensively quote and rely upon the Agreement in their pleadings, and the parties and the Court are in possession of a complete copy of it, the authenticity of which is undisputed. Accordingly, we may consider it on this motion to dismiss. *See, e.g.*, *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) ("Although the amended complaint in this case does not incorporate

the Agreement, it relies heavily upon its terms and effect; therefore, the Agreement is 'integral' to

the complaint, and we consider its terms in deciding whether [the plaintiff] can prove any set of facts

that would entitle it to relief.").  In addition, we may consider the eleven designs created by ODM

and the Certificates of Copyright Registration, all of which are attached to the pleadings as exhibits.

*See, e.g.*, *Smart*, 441 F. Supp. 2d at 637.

## II.      Counts One, Two and Three: Copyright Infringement

Counts One, Two and Three of ODM's Counterclaims assert claims for copyright

infringement, contributory copyright infringement and vicarious copyright infringement,

respectively.  In order to establish a claim for copyright infringement under 17 U.S.C. § 501, a

plaintiff must show that: (1) he owns the copyright in the work at issue;[10] (2) the copyright has been

registered in accordance with the statute;[11] and (3) the defendant copied constituent elements of the

work that are original.[12]  *See Fonar Corp. v. Domenick*, 105 F.3d 99, 104 (2d Cir. 1997) (citing *Feist*

*Publ'ns Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)); *Chere Amie, Inc. v. Windstar*

---

[10] *See* 17 U.S.C. § 501(b) ("The legal or beneficial owner of an exclusive right under a copyright is entitled, subject to the requirements of section 411, to institute an action for any infringement of that particular right committed while he or she is the owner of it.").

[11] *See* 17 U.S.C. § 411(a) ("Except for an action brought for a violation of the rights of the author under section 106A(a), and subject to the provisions of subsection (b), no action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title.").

[12] In order to satisfy the third element, a plaintiff must establish that: (1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's work.  *See Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 110 (2d Cir. 2001); *Vanlines.com LLC v. Net-Marketing Group Inc.*, No. 06 Civ. 5577, 2007 WL 1345205, at *2 (S.D.N.Y. May 7, 2007).

*Apparel, Corp.*, 191 F. Supp. 2d 343, 349 (S.D.N.Y. 2001).  The issuance of a certificate of registration for a copyright "is *prima facie* evidence that the copyright is valid." *Fonar*, 105 F.3d at 104; *see also Pem-Am., Inc. v. Sunham Home Fashions, LLC*, 83 F. App'x 369, 371 (2d Cir. 2003); *Chere Amie*, 191 F. Supp. 2d at 349.

As to the first two elements, ODM has established a presumption that the copyrights in the designs at issue are valid because it alleges that they are all registered with the United States Copyright Office (the "Copyright Office") and has attached to its pleadings Certificates of Copyright Registration for eleven of them.  (*See* Counterclaims, Ex. A.)  As to the third element, ODM alleges that OCC provided its copyrighted designs to other OCC licensees, including VSI and Interbrand, which then advertised or sold merchandise containing designs that were substantially similar to those owned by ODM.  (*See* Counterclaims ¶¶ 16-24, 26-27, 32-33.)  Accordingly, ODM has alleged a *prima facie* case for copyright infringement.

However, OCC, VSI and Interbrand contend that ODM transferred the copyrights in the designs to OCC pursuant to ¶ E of the Standard Terms and Conditions of the Agreement, which, as noted, provides:

> [OCC] and [ODM] acknowledge and agree that to the extent that [ODM's] graphic designs, including, but not limited to, the creative elements contained therein can be separated from [OCC's] Property, [ODM] shall retain ownership of the graphic designs and/or creative elements; however, if such graphic designs created by [ODM] cannot be separated from [OCC's] Property, [OCC] shall own the graphic designs.

OCC, Interbrand and VSI argue that the graphic designs cannot be "separated" from the OCC Property, and OCC therefore owns the copyrights in them.  Moreover, they argue that, even if the graphic designs were separable from the OCC Property, ODM has failed to register with the Copyright Office the constituent elements of the designs that do not include the OCC Property and

10

it therefore cannot bring an infringement suit in connection therewith.  We disagree.

The Copyright Act allows ownership of a copyright to "be transferred in whole or in part by any means of conveyance" if the instrument of conveyance is in writing and signed by the owner of the rights conveyed.  *See* 17 U.S.C. §§ 201(d), 204(a).  Normal principles of contractual interpretation apply to agreements to transfer copyrights, and courts must give the language its plain meaning and full effect.  *See T. B. Harms Co. v. Eliscu*, 339 F.2d 823, 827 n.2 (2d Cir. 1964) (Friendly, J.); *Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co.*, 145 F.3d 481, 487-88 nn.3 & 4 (2d Cir. 1998) (instructing courts "to rely on the language of the license contract and basic principles of interpretation" in construing a copyright conveyance); *Rico Records Distribs., Inc. v. Ithier*, No. 04 Civ. 9782, 2006 WL 846488, at *1 (S.D.N.Y. Mar. 30, 2006); *Shugrue v. Continental Airlines, Inc.*, 977 F. Supp. 280, 285-86 (S.D.N.Y. 1997); *Lieberman v. Chayefsky's Estate*, 535 F. Supp. 90, 91 n.4 (S.D.N.Y. 1982) ("an assignment of a copyright[ is] a transaction governed by contract law."); *see also* 18 C.J.S. COPYRIGHTS § 29 ("Principles of contract law are generally applicable to the construction of copyright transfers and licenses.") (internal footnotes omitted).

"Under New York law,[13] the initial interpretation of a contract is a matter of law for the court to decide."  *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002) (internal quotation marks omitted; citations omitted).  "The key inquiry at this initial interpretation stage is whether the contract is unambiguous with respect to the question disputed by the parties."  *Id.*; *see also RJE Corp. v. Northville Indus. Corp.*, 329 F.3d 310, 314 (2d Cir. 2003). "In interpreting a contract under New York law, 'words and phrases . . . should be given their plain meaning,' and

---

[13] The Agreement contains a choice of law provision providing that it should be construed under the law of New York.  (*See* Neidl Aff'm, Ex. C, ¶ 5.)

the contract 'should be construed so as to give full meaning and effect to all of its provisions.'" *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (quoting *Shaw Group, Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121 (2d Cir. 2003)); *Faulkner v. Nat'l Geographic Soc'y*, 452 F. Supp. 2d 369, 375 (S.D.N.Y. 2006) (quoting *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990) ("The parties' rights under an unambiguous contract should be fathomed from the terms expressed in the instrument itself rather than from extrinsic evidence as to terms that were not expressed or judicial views as to what terms might be preferable.")). Language that has a generally prevailing meaning should be interpreted in accordance with that meaning. *See* RESTATEMENT 2d CONTRACTS § 202.

Section E of the Agreement by its very terms grants ownership of the graphic designs to ODM, unless they cannot be separated from the OCC Property, in which case OCC would own them. In deciding whether the graphic designs can be "separated" from the OCC Property, we must determine whether they can be physically set apart from the proprietary symbols, trademarks and trade dress of OCC and still be eligible for copyright protection. *See* Black's Law Dictionary 7th ed.; http://www.m-w.com/dictionary/separated. Although the plain meaning of "separated" does not necessitate that the graphic designs, when set apart, be independently eligible for copyright protection, words must be interpreted in accordance with "'the reasonable expectation and purpose of the ordinary businessperson in the factual context in which the terms of art and understanding are used[] . . . .'" *Eastman Kodak Co. v. STWB Inc.*, 232 F. Supp. 2d 74, 91 (S.D.N.Y. 2002) (quoting *Uribe v. Merchants Bank of N.Y.*, 91 N.Y.2d 336, 693 N.E.2d 740, 743, 670 N.Y.S.2d 393 (1998) (internal citation omitted)). In the context of copyright ownership, whether a part of an entire design is separable depends, in part, on whether it is independently copyrightable. *See Childress v. Taylor*,

12

945 F.2d 500, 505-06 (2d Cir. 1991) (explaining that, in the context of joint works, parts of a unitary whole are separable when they have meaning standing alone and are independently copyrightable).[14] Although we are unable to make the appropriate determination with respect to the designs at issue that are not attached to the pleadings and must therefore accept as true ODM's allegation that it owns valid copyrights in those designs, (*see* Counterclaims ¶ 13) we are not bound by ODM's allegations regarding the eleven designs attached to its pleadings.

With respect to these, we find that the graphic designs "can be separated" from the OCC Property. When set apart from the OCC Property, the designs consist of original graphic works comprising an array of creative elements that are clearly independently copyrightable. For example, ODM's "Iron Feathers" design includes iron feathered wings, red flames and other assorted stylistic elements, all of which are uniquely arranged. (*See* Counterclaims, Ex. A-1.) The words "Orange County Choppers" and "OCC" do not dominate the design and could easily be separated from the underlying pictorial image. Similarly, the "OCC Iron Plate," when set apart from the OCC Property, includes a shield mounted upon a vertically positioned arrow and two crossing sword-like objects with stylized flames rising from the base of the design. (*See id.*, Ex. A-3.) Other designs include stylistic tail pipes superposed on a shield with flames emanating at the top of the design, a drawing of an eagle with flame-like wings and drawings of motorcycles. (*See id.*, Exs. A-4, 5, 8, 10, 11.)

---

[14] The apparent intent behind ¶ E of the Standard Terms and Conditions of the Agreement is to maintain OCC's ownership of the OCC Property and, to the extent that the designs are inseparable from the OCC Property, to avoid effectively transferring ownership in the OCC Property by virtue of ODM's ownership in the overall design. For example, if the design consisted merely of the words "OCC," however depicted, ODM would not own the design. However, if the design included ornate drawings and the words "OCC," OCC could not claim ownership of the complete design merely because its property was incorporated therein. In the latter case, OCC would retain its ownership of its property and ODM would retain ownership of the design unaccompanied by the OCC Property.

Certainly these designs are "original works of authorship fixed in a[] tangible medium of expression" eligible for copyright protection.  17 U.S.C. § 102(a); s*ee Feist Publ'ns*, 499 U.S. at 345 ("Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity. . . .  To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice.  The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be.") (internal citations omitted; quotation marks omitted).

Nevertheless, OCC argues that, even if the graphic designs were "separable" from the OCC Property, ODM's infringement claim would still fail because ODM has not separately registered with the Copyright Office the constituent elements of the designs that do not include the OCC Property.  (*See* OCC Mem. Supp. Mot. Dismiss at 18.)  Although the Copyright Act requires a litigant to register his copyright claim with the Copyright Office prior to initiating an infringement suit, s*ee* 17 U.S.C. § 411(a), OCC cites no authority, and we can find none, for the proposition that the removal from a registered work of non-copyrightable elements, such as the words "OCC" and "Orange County Choppers,"[15] requires re-registration of the design, particularly when the registered work subsumes the modified version.[16]  Moreover, because the act of copying the designs with or without

---

[15] Words and short phrases are not copyrightable.  *See, e.g.*, 37 C.F.R. § 202.1 (2007).

[16] It is the case, however, that an author of a derivative work cannot rely upon the registration of the copyright in the original and must therefore separately register a copyright in the derivative work.  *See Well-Made Toy Mfg. Corp. v. Goffa Int'l Corp.*, 354 F.3d 112, 115 (2d Cir. 2003).  But the designs at issue here are original works themselves created by ODM that merely incorporate OCC's trade name in accordance with the Agreement and, as such, the law applicable to derivative works is inapposite.  *See* 17 U.S.C. § 101 ("A 'derivative work' is a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion

the OCC Property would constitute copyright infringement, *see Yurman Design*, 262 F.3d at 110 (infringement claim requires only a substantial similarity between the defendant's work and the *protectible* elements of the plaintiff's work), requiring the additional registration of the separated designs achieves no practical objective beyond that already achieved by the registration of the entire design. Thus, under the present circumstances, ODM is not required to re-register the separated designs and, accordingly, may maintain this action for copyright infringement.

## III.  Counts Four, Five and Six: OCC's Alleged Distribution of the Designs to VSI, Interbrand and Other OCC Licensees

Next, OCC moves to dismiss Counts Four, Five and Six of ODM's Counterclaims sounding in breach of contract, unjust enrichment and unfair competition, respectively. Each claim generally alleges that OCC supplied to its other licensees the designs created and owned by ODM without ODM's permission. First, OCC argues that ODM's breach of contract claim fails for the same reasons as its copyright claims, *i.e.*, ODM transferred ownership in the designs to OCC pursuant to ¶ E of the Standard Terms and Conditions of the Agreement. Although we have rejected this argument, ODM's breach of contract claim fails for reasons not asserted by OCC. Specifically, ¶ E does not prohibit OCC from distributing the designs created by ODM, but it merely addresses the division of ownership of the designs. The Agreement's failure to specifically prohibit the unauthorized use of ODM's intellectual property is hardly surprising, however, as federal copyright

---

picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted."). Moreover, in the case of a derivative work, there are at least two works that are eligible for copyright protection, whereas here the OCC Property is not clearly copyrightable and the only aspects of the designs that are eligible for copyright protection were created by ODM. It is thus senseless to require re-registration of a work after simply removing components that are probably not even eligible for copyright protection themselves.

law undoubtedly governs the matter. Although courts are split on whether the Copyright Act preempts a breach of contract claim, *see, e.g.*, *eScholar, LLC v. Otis Educ. Sys., Inc.*, 387 F. Supp. 2d 329, 332 (S.D.N.Y. 2005), we need not address this issue because ODM fails to allege the specific provision of the Agreement that OCC allegedly breached – an essential requirement for a breach of contract claim. *See, e.g.*, *Wolff v. Rare Medium, Inc.*, 210 F. Supp. 2d 490, 494 (S.D.N.Y. 2002) ("When pleading . . . [a breach of contract claim], a plaintiff must identify the specific provision of the contract that was breached as a result of the acts at issue."), *aff'd*, 65 F. App'x 736 (2d Cir. 2003); *see also Wolff v. Rare Medium, Inc.*, 65 F. App'x 736, 738 (2d Cir. 2003) ("plaintiffs' identification of Article IV, section 4.4(a) as the provision breached by [defendant] is deficient as a matter of law because the plain language of that section imposes no obligations on [defendant]; it serves only to restrict plaintiffs' disposition of their exchanged shares."). Accordingly, Count Four of ODM's Counterclaims for breach of contract is dismissed.[17]

Second, OCC argues that Count Five of ODM's Counterclaims for unjust enrichment must be dismissed because ¶ E of the Agreement governs the subject matter of design ownership and therefore precludes recovery on a *quasi-contract* theory.[18] Although, as discussed, ¶ E does not specifically govern the parties' right to distribute the designs created by ODM, and thus OCC's

---

[17] Although it is clear that no explicit provision of the Agreement prohibits OCC from misappropriating ODM's property, it is well-established that under New York law, a covenant of good faith and fair dealing is implied in all contracts. As discussed *infra* p. 28, our determination that the challenged conduct did not violate the express terms of the Agreement does not limit ODM's ability to recover for breach of the implied covenant of good faith and fair dealing.

[18] Under New York law, an enforceable contract between the parties concerning a particular subject matter precludes quasi-contractual recovery in unjust enrichment for claims arising out of the same subject matter. *See Clark-Fitzpatrick, Inc. v. L.I.R.R. Co.*, 70 N.Y.2d 382, 388, 516 N.E.2d 190, 521 N.Y.S.2d 653 (1987); *Maalouf v. Salomon Smith Barney, Inc.*, No. 02 Civ. 4770, 2003 WL 1858153, at *7 (S.D.N.Y. Apr. 10, 2003).

argument is to no avail, we hold that ODM's unjust enrichment claim must be dismissed because it is preempted by federal copyright law.

"The Copyright Act preempts state law causes of action that are 'equivalent to any of the exclusive rights within the general scope of copyright. . . .'" *eScholar*, 387 F. Supp. 2d at 332 (quoting 17 U.S.C. § 301(a)); *see also Samara Bros., Inc. v. Wal-Mart Stores, Inc.*, 165 F.3d 120, 131 (2d Cir. 1998). Specifically, "[t]he Copyright Act exclusively governs a claim when: (1) the particular work to which the claim is being applied falls within the type of works protected by the Copyright Act under 17 U.S.C. §§ 102 and 103, and (2) the claim seeks to vindicate legal or equitable rights that are equivalent to one of the bundle of exclusive rights already protected by copyright law under 17 U.S.C. § 106." *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 305 (2d Cir. 2004) (citing 17 U.S.C. § 301(a)); *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 848 (2d Cir. 1997).

> The first prong of this test is called the "subject matter requirement," and the second prong is called the "general scope requirement." *See Nat'l Basketball Ass'n*, 105 F.3d at 848.
>
> The subject matter requirement is satisfied if the claim applies to a work of authorship fixed in a tangible medium of expression and falling within the ambit of one of the categories of copyrightable works. *Id.* at 848-49. These categories encompass literary works and motion pictures, 17 U.S.C. § 102(a), including those based on preexisting works, 17 U.S.C. §§ 101, 103. A work need not consist entirely of copyrightable material in order to meet the subject matter requirement, but instead need only fit into one of the copyrightable categories in a broad sense. *See Nat'l Basketball Ass'n*, 105 F.3d at 848-50.

*Briarpatch*, 373 F.3d at 305. Clearly the designs at issue here fall within "the copyrightable categories in a broad sense." *See* 17 U.S.C. § 102(a) ("Works of authorship include . . . pictorial, graphic, and sculptural works . . . .").

17

The second prong – the general scope requirement – "is satisfied only when the state-created right may be abridged by an act that would, by itself, infringe one of the exclusive rights provided by federal copyright law." *Briarpatch*, 373 F.3d at 305 (citing *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 716 (2d Cir. 1992)). "In other words, the state law claim must involve acts of reproduction, adaptation, performance, distribution or display." *Id.* (citing 17 U.S.C. § 106; *Computer Assocs. Int'l*, 982 F.2d at 716). Here, ODM's unjust enrichment claim is based on the allegation that "OCC has supplied ODM Designs to other OCC Licensees without permission from ODM." (*See* Counterclaims ¶ 43.) Because these OCC licensees are reproducing and distributing the ODM designs, the unjust enrichment claim falls squarely within the ambit of the Copyright Act.

Moreover, to be preempted, "the state law claim must not include any extra elements that make it qualitatively different from a copyright infringement claim." *Briarpatch*, 373 F.3d at 305 (citing *Nat'l Basketball Ass'n*, 105 F.3d at 851).

> [I]f an "extra element" is "required instead of or in addition to the acts of reproduction, performance, distribution or display, in order to constitute a state-created cause of action, then the right does not lie 'within the general scope of copyright,' and there is no preemption."

*Samara Bros.*, 165 F.3d at 131 (quoting *Computer Assocs. Int'l*, 982 F.2d at 716; 1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 1.01[B]). Here, ODM's unjust enrichment claim requires nothing more that makes it qualitatively different from the federal copyright claim. "The basic elements of an unjust enrichment claim in New York require proof that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Briarpatch*, 373 F.3d at 306 (citing *Clark v. Daby*, 300 A.D.2d 732, 751 N.Y.S.2d 622, 623 (3d Dep't 2002)). Under ODM's theory of the

18

case, the act that satisfies the second and third elements of unjust enrichment is OCC's inducement of the reproduction and distribution of the designs by its licensees.  This, of course, falls within the exclusive rights protected by 17 U.S.C. § 106(3) ("to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending . . . .").  Although ODM also alleges that OCC was unjustly enriched by its act – an element not required for a copyright infringement claim –, this does not go "far enough to make the unjust enrichment claim qualitatively different from a copyright infringement claim." *Briarpatch*, 373 F.3d at 306.  Accordingly, ODM's unjust enrichment claim is dismissed because it is preempted by the Copyright Act.  *See, e.g.*, *id.*

The same is true for ODM's unfair competition claim.  It is axiomatic that "'unfair competition and misappropriation claims grounded solely in the copying of a plaintiff's protected expression are preempted by [the Copyright Act].'"  *Samara Bros.*, 165 F.3d at 131 (quoting *Computer Assocs. Int'l*, 982 F.2d at 717); *see also Hudson v. Imagine Entm't Corp.*, 128 F. App'x 178, 179 (2d Cir. 2005) (quoting *Briarpatch*, 373 F.3d at 305).  ODM maintains, however, that its unfair competition claim "alleges the extra elements of 'bad faith misappropriation' and 'using ODM's property to compete against ODM's use of the same property.'" (*See* ODM Mem. Opp. Mot. Dismiss at 13.)  Bad faith, as used here, is undoubtedly a reference to OCC's state of mind, and "'[a]n action will not be saved from preemption by elements such as awareness or intent, which alter "the action's scope but not its nature[.]"'"  *Samara Bros.*, 165 F.3d at 131 (quoting *Computer Assocs. Int'l*, 982 F.2d at 717).  Similarly, ODM's allegation that OCC used "ODM's property to

19

compete against ODM's use of the same property" is the very essence of an infringement claim.[19]

ODM's unfair competition claim does not, for example, allege that OCC breached a fiduciary duty

or a confidential relationship or disclosed trade secrets – allegations that would make it qualitatively

different. *See Computer Assocs. Int'l*, 982 F.2d at 717; *Irwin v. ZDF Enterprises GmbH*, No. 04

CIV. 8027, 2006 WL 374960, at *5 n.4 (S.D.N.Y. Feb. 16, 2006) ("While there may be

circumstances under which an unfair competition claim would not be preempted by federal copyright

law, such as where such claims were based upon breaches of confidential relationships, breaches of

fiduciary duties and trade secrets, . . . none of these grounds underlie Plaintiffs' claim of unfair

competition in the instant case."). Clearly, ODM's unfair competition and copyright infringement

claims are duplicative in substance and objective and are thus governed exclusively by the Copyright

Act. Accordingly, ODM's claim for unfair competition must be dismissed.

## IV. Counts Eight and Nine: Breach of the Agreement's Exclusivity Provision

Counts Seven, Eight and Nine of ODM's Counterclaims for breach of contract, unjust

enrichment and unfair competition, respectively, allege that OCC breached the Agreement by

licensing other entities to use the OCC logos, trademarks and other controlled designs in connection

with the manufacture, distribution, sale, and advertising of T-shirts, fleeces and jerseys in violation

of the exclusivity provisions. (*See* Counterclaims ¶¶ 53, 57-59, 61-64.) Although ODM does not

cite a controlling provision of the Agreement, ¶ 2(a)(i) clearly provides that OCC "grants to [ODM]

---

[19] The fact that OCC allegedly used the designs to compete with ODM falls within the ambit of the Copyright Act and will be taken into account when damages are assessed pursuant to 17 U.S.C. § 504(b) ("The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages.").

. . . the exclusive right and license to use the [OCC] Property in connection with the manufacture, distribution, sale, and advertising of the Licensed Products through all channels of distribution." (*See* Neidl Aff'm, Ex. A (Agreement ¶ 2(a)(i)).)  OCC thus moves to dismiss only the unjust enrichment and unfair competition claims.

OCC argues that ODM's unjust enrichment claim must be dismissed because a valid and enforceable contract governs ODM's right to the exclusive use of the OCC Property and it is therefore precluded from recovering under a quasi-contractual theory.  ODM responds that its unjust enrichment claim is proper because it is pled in the alternative in accordance with FED. R. CIV. P. 8(a).  Although, as noted *supra* n.15, New York law precludes litigants from recovering under both contractual and quasi-contractual theories, s*ee, e.g.*, *Clark-Fitzpatrick*, 70 N.Y.2d at 388; *see also Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 587 (2d Cir. 2006) ("*Clark-Fitzpatrick* precludes unjust enrichment claims whenever there is a valid and enforceable contract governing a particular subject matter, whether that contract is written, oral, or implied-in-fact."), FED. R. CIV. P. 8(a) allows plaintiffs to plead the two theories alternatively.  *See, e.g.*, *Maalouf*, 2003 WL 1858153, at \*7 ("The fact that [plaintiff] may only *recover* on one claim, either contract or quasi-contract, certainly does not preclude him from *pleading* unjust enrichment in the alternative.") (emphasis in original).

Nevertheless, ODM has failed to allege any facts that give rise to an unjust enrichment claim. As with many of its claims, ODM fixates on its abstract right to plead alternative theories of liability without actually addressing whether its proposed alternative claims have support in the law.  Plainly, pleading a claim in the alternative does not absolve the pleader from adequately alleging the existence of each element of each claim.  This principle is apparently lost on ODM, which, when

21

describing its alternative claims, appears to pick and choose elements from its primary claims in a vain attempt to conjure additional causes of action. We are unpersuaded.

It is basic logic that when analyzing ODM's alternative claim for unjust enrichment, we must assume that the Agreement is not valid or enforceable and refrain from taking refuge in any of its provisions. *See Beth Israel Med. Ctr.*, 448 F.3d at 586. Our analysis is thus limited to determining whether ODM has alleged the three essential elements of an unjust enrichment claim, namely: (1) that OCC benefitted; (2) at ODM's expense; and (3) that equity and good conscience require restitution. *See, e.g.*, *id.* Moreover, "[i]t is important to note . . . the nature of an unjust enrichment claim in New York: 'The theory of unjust enrichment lies as a quasi-contract claim. It is an obligation the law creates in the absence of any agreement[]'" to prevent a party from profiting inequitably. *Id.* at 586, 587 (quoting *Goldman v. Metro. Life Ins. Co.*, 5 N.Y.3d 561, 572, 841 N.E.2d 742, 807 N.Y.S.2d 583 (2005) (citations omitted); *Clark-Fitzpatrick*, 70 N.Y.2d at 388-89).

Highlighting the fatal flaw of its unjust enrichment claim, ODM alleges that OCC was unjustly enriched by breaching the express provisions of the Agreement. (*See* Counterclaims ¶ 58 ("OCC has profited through licensing other entities to use the OCC logos, trademarks, and other controlled designs in violation of the exclusivity provisions of its Agreements with ODM.").) As it is plainly evident from ODM's own allegations, absent the Agreement's express provision providing ODM the exclusive right to use the OCC Property in connection with the manufacture and sale of the Licensed Products, OCC has no legal obligation to refrain from licensing other entities to do the same. Any such obligation arises only by agreement. Indeed, the disputed conduct here falls squarely within the terms of the Agreement and ODM does not have an independent right to exclusive use of the OCC Property. Accordingly, OCC's motion to dismiss Count Eight of ODM's

Counterclaims for unjust enrichment is granted.

OCC also argues that Count Nine of ODM's Counterclaims for unfair competition must be dismissed because it is duplicative of ODM's claim for breach of contract and "a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated[.]" *See Clark-Fitzpatrick*, 70 N.Y.2d at 389 (internal citations omitted). Again, we agree that Count Nine simply reasserts the allegations in Count Seven for breach of contract – that OCC licensed other entities to use the OCC Property to manufacture and sell Licensed Products in violation of the Agreement's exclusivity provision. It is well-settled, however, that no claim lies where its underlying allegations are "merely a restatement, albeit in slightly different language, of the 'implied' contractual obligations asserted in the cause of action for breach of contract . . . ." *Id.* at 390. Here, ODM has not alleged that OCC violated a legal duty independent of the contract and, in fact, has once again alleged a breach of the express provision of the Agreement to make out its claim. Obviously, ODM's right to exclusive use of the OCC Property to manufacture and sell Licensed Products is solely grounded in the Agreement and does not spring from any independent legal duty such as a fiduciary relationship. *See Ross v. FSG PrivatAir, Inc.*, No. 03 Civ. 7292, 2004 WL 1837366, *6 (S.D.N.Y. Aug. 17, 2004); *see also Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 552, 593 N.E.2d 1365, 583 N.Y.S.2d 957 (1992) ("[W]here plaintiff is essentially seeking enforcement of the bargain, the action should proceed under a contract theory . . . ."). Accordingly, OCC's motion to dismiss Count Nine of ODM's Counterclaims for unfair competition is granted.

## V.     Count Ten: OCC's Alleged Withholdings of Design Approval

OCC moves to dismiss Count Ten of ODM's Counterclaims for breach of contract alleging

23

that OCC unreasonably withheld approval of ODM's proposed designs in violation of ¶ A(2)(e) of

the Standard Terms and Conditions of the Agreement, which provides:

> Time for Approval by Licensor/Agent. Licensor/Agent agree to use
> reasonable efforts to notify Licensee in writing of its approval or
> disapproval of any materials submitted to it under Sections A(2)(b)
> and A(2)(c) within fifteen (15) days after its receipt of such materials,
> and agree, in the case of its disapproval, to notify Licensee in writing
> of its reasons for disapproval. In the event Licensor fails to approve
> or disapprove of any materials submitted as provided for above within
> twenty (20) days after Licensor's receipt of such materials from
> Agent, the materials shall be automatically deemed disapproved.

Specifically, ODM alleges that OCC intentionally delayed approval of ODM's designs for several

months to force renegotiation of the Agreement in an effort to obtain more consideration for its

license and certain unspecified concessions from ODM, thereby breaching the Agreement's

requirement that it "use reasonable efforts to notify [ODM] in writing of its approval or disapproval

. . . ." (*See* Counterclaims ¶¶ 69-71.) OCC contends that, because the Agreement provided that the

proposed designs are deemed disapproved in the event that OCC failed to approve them after twenty

days, obviating the need for ODM to wait more than twenty days for a response, the plain language

of "the contract makes it impossible for OCC to 'unreasonably delay' approval or disapproval of

designs." (*See* OCC Mem. Supp. Mot. Dismiss at 13.)

OCC's interpretation is flawed, however, as it would render the Agreement's reasonableness

requirement meaningless. *See Tokio Marine & Fire Ins. Co. v. Rosner*, 206 F. App'x 90, 93 (2d Cir.

2006) ("The law . . . disfavors contract constructions that render provisions meaningless.").

Although OCC's silence may have the effect of a disapproval, § A(2)(e) of the Agreement explicitly

requires OCC "to use reasonable efforts to notify [ODM] in writing of its approval or disapproval

of any materials submitted to it . . . within fifteen (15) days after" receipt. Plainly, if OCC withheld

notice of approval or disapproval in order to coerce ODM into accepting certain concessions in connection with renegotiation of the Agreement, OCC cannot be said to have "use[d] reasonable efforts to notify [ODM] in writing of its approval or disapproval . . . ."  Accordingly, OCC's motion to dismiss Count Ten for breach of contract is denied.


**VI.**   **Counts Twelve and Thirteen: Overpayment of Royalties**

OCC moves to dismiss Count Twelve of ODM's Counterclaims asserting a breach of contract claim against OCC alleging that OCC has refused to return royalties mistakenly overpaid to it by ODM in excess of approximately $1 million of the amount due under the Agreement.  (*See* Counterclaims ¶¶ 85-87.)  It argues that ODM has failed to cite a provision of the Agreement that allows it to make "retroactive" adjustments to royalty calculations or entitles it to a refund of an overpayment of royalties.  ODM, for its part, cites ¶ 4(b)(i) of the Agreement which provides:

> [ODM] shall pay [OCC] a percentage of royalty of eight percent (8%) of the Net Sales Price on all mass market and lower, or ten percent (10%) of the Net Sales Price on all other distribution of the Licensed Products by Licensee to its customers or distributors.

Moreover, ¶ C(2) of the Agreement's Standard Terms and Conditions provides: "[ODM] shall pay all royalties owing to [OCC] under this Agreement in accordance with the payment schedule set forth in paragraph 4 of this Agreement . . . ."  ODM argues that these provisions must be reasonably construed to allow reimbursement of any royalties that ODM mistakenly paid in excess of the amount due.

Although we agree that the Agreement does not include any explicit provision that provides ODM the right to reimbursement of overpaid royalties, "[u]nder New York law, every contract

contains an implied covenant of good faith and fair dealing." *Carvel Corp. v. Diversified Mgmt. Group, Inc.*, 930 F.2d 228, 230 (2d Cir. 1991). "This covenant includes 'an implied undertaking on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out the agreement on his part." *Id.* (quoting *Grad v. Roberts*, 14 N.Y.2d 70, 75, 198 N.E.2d 26, 28, 248 N.Y.S.2d 633, 637 (1964)). "In most circumstances, claims for breach of contract and the covenant of good faith and fair dealing are duplicative; however, in some cases 'a party may be in breach of its implied duty of good faith and fair dealing even if it is not in breach of its express contractual obligations.'" *Echostar DBS Corp. v. Gemstar-TV Guide Int'l, Inc.*, No. 05 Civ. 8510, 2007 WL 438088, at \*7 (S.D.N.Y. Feb. 8, 2007) (quoting *Chase Manhattan Bank v. Keystone Distrib., Inc.*, 873 F. Supp. 808, 815 (S.D.N.Y. 1994)). "The covenant 'precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement.'" *Id.* (quoting *Leberman v. John Blair & Co.*, 880 F.2d 1555, 1560 (2d Cir. 1989)). "Hence, the covenant is violated 'when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other of the right to receive the benefits under the agreement." *Id.* (quoting *Don King Prods., Inc. v. Douglas*, 742 F. Supp. 741, 767 (S.D.N.Y. 1990)).

In the present case, the Agreement obligates ODM to pay OCC a certain amount of royalties in consideration for a license to use its Property and does not expressly prohibit ODM from recovering royalties mistakenly overpaid.[20] Thus, the Agreement's implied covenant of good faith

---

[20] OCC argues that the express terms of ¶¶ C(5), (6) and (8) prohibit ODM from seeking reimbursement of the overpaid royalties. To the contrary, ¶ C(5) provides that ODM must provide OCC a "full and complete statement, duly certified [by ODM] to be true and accurate . . .[,]" ¶ C(6) provides OCC the right to question the accuracy of the statements at any time and ¶ C(8) provides that ODM must keep accurate books of account and records covering all transactions relating to the

and fair dealing prohibits OCC from retaining royalties that were provided to it by mistake and to which it is not contractually entitled.[21]  ODM's claim for its alleged overpayments is thus properly termed a breach of the covenant of good faith and fair dealing, which ODM alleges in Count Eleven, and not a breach of any express provision of the contract as alleged in Count Twelve.  Accordingly, Count Twelve is dismissed, and OCC's motion to dismiss Count Eleven  for breach of the covenant of good faith and fair dealing to the extent that it relates to the overpayment of royalties is denied.

OCC also moves to dismiss Count Thirteen of ODM's Counterclaims for unjust enrichment alleging the overpayment of royalties.  It contends that the existence of a valid and enforceable contract governing the issue precludes recovery under an unjust enrichment theory.  However, ODM may plead this claim in the alternative, *see* FED. R. CIV. P. 8(a), and it has clearly alleged that OCC's conduct led to its unjust enrichment.  Accordingly, OCC's motion to dismiss Count Thirteen of ODM's Counterclaims is denied.

## VII.    Count Eleven: Breach of the Covenant of Good Faith and Fair Dealing

Count Eleven of ODM's Counterclaims asserts a claim for the breach of the covenant of good faith and fair dealing and mirrors the allegations of Counts Four, Seven, Ten and Twelve, all of which assert causes of action for breach of the express contract.  Specifically, Count Eleven alleges that OCC breached the covenant of good faith and fair dealing by: (1) supplying the designs allegedly owned by ODM to other parties without ODM's permission; (2) licensing other entities to use OCC

---

rights and licenses granted under the Agreement.  These provisions do not unambiguously bar ODM from collecting royalties mistakenly overpaid to OCC.

[21] Although OCC disputes the fact that ODM mistakenly overpaid royalties, this is a factual allegation that must be accepted as true on a motion to dismiss.

Property; (3) unreasonably delaying design approvals; and (4) retaining royalties that ODM mistakenly overpaid. Because the allegations underlying Count Eleven are identical to ODM's breach of contract claims alleged in Count Seven and Ten, OCC contends that they should be dismissed as duplicative. We agree. Count Seven, for breach of ¶ 2(a)(i) of the Agreement (the exclusivity provision), and Count Ten, for breach of ¶ A(2)(e) of the Standard Terms and Conditions of the Agreement (the design approval provision), clearly allege breaches of the express provisions of the Agreement and thus supersede a claim for breach of the covenant of good faith and fair dealing. *See, e.g., Cohen v. Elephant Wireless, Inc.*, No. 03 Civ. 4058, 2004 WL 1872421, at *11 (S.D.N.Y. Aug. 19, 2004) (dismissing a claim for breach of the covenant of good faith and fair dealing because it was duplicative of the breach of contract claim).

Although Count Eleven's allegation that OCC supplied ODM's designs to other parties without its permission mirrors ODM's breach of contract claim asserted in Count Four, we are dismissing the latter claim for the reasons explained above at pages 15-16. Thus, insofar as Count Eleven is based on OCC's distribution of ODM's designs to others, it is not duplicative of any claimed breach of an explicit contractual provision and must therefore remain.[22] Additionally, as discussed *supra* Part VI, Count Eleven properly asserts a claim for the breach of the covenant of good faith and fair dealing with respect to OCC's retention of the royalties that were allegedly overpaid by ODM. Accordingly, OCC's motion to dismiss Count Eleven is denied, but the Count

---

[22] Assuming that OCC has moved to dismiss Count Eleven with respect to this allegation – that OCC distributed the designs without ODM's permission – on the ground that it does not state a claim upon which relief can be granted, its motion is denied. Although the Agreement does not contain an express provision prohibiting OCC from distributing the designs, it provides that ODM owns the separated graphic designs, which if distributed by OCC without ODM's permission, would surely "'deprive [ODM] of the benefits of their agreement.'" *Echostar DBS*, 2007 WL 438088, at 7 (quoting *Leberman*, 880 F.2d at 1560).

remains only to the extent that it relates to OCC's alleged distribution of the designs[23] and the overpayment of royalties.

## VIII. Count Fourteen: Tortious Interference with Contractual Relations

Finally, OCC moves to dismiss Count Fourteen of ODM's Counterclaims for tortious interference with contractual relations. (*See* Counterclaims ¶¶ 90-96.) "Under New York law, the elements of a tortious interference claim are: (a) that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff." *Albert v. Loksen*, 239 F.3d 256, 274 (2d Cir. 2001). Moreover, a plaintiff must allege that the "defendant used 'wrongful means' to induce the third party to breach the contract." *Wolff*, 210 F. Supp. 2d at 499 (citing *Guard-Life Corp. v. S. Parker Mfg. Corp.*, 50 N.Y.2d 183, 406 N.E.2d 445, 448-49, 428 N.Y.S.2d 628 (1980)). "'Wrongful means' includes physical violence, fraud, or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure." *Id.* (citing *Guard-Life*, 428 N.Y.S.2d 628, 406 N.E.2d at 449).

In the present case, ODM alleges that it entered into a licensing agreement with Discovery

---

[23] We are aware that Judges in this District are split on whether claims for breach of contract and breach of covenant of good faith and fair dealing are preempted by federal copyright law, and the Second Circuit has yet to address the issue. *See, e.g.*, *eScholar*, 387 F. Supp. 2d at 332. The majority view is clearly that such claims are not preempted, and the Second Circuit has recognized that "there is some support for the general principle that an implied-in-fact contract claim is not preempted by federal copyright law . . . ." *Willis v. Home Box Office*, 57 F. App'x 902, 903 (2d Cir. 2003). Accordingly, at this stage, we decline to dismiss this claim on preemption grounds. Indeed, it will not lead to any additional discovery because it is based on the same underlying facts as the copyright claim, and the overall Count would remain in any event with respect to the overpayment of royalties.

29

granting it the right to manufacture, promote, advertise, sell and distribute merchandise with the brand name "American Choppers," the Discovery television show featuring OCC. (*See* Counterclaims ¶ 91.) ODM claims that OCC threatened to cease production of "American Choppers" if Discovery did not terminate its agreement with ODM, which caused Discovery to revoke its agreement with ODM. (*See id.* ¶¶ 94-95.) It also alleges that, at a trade show in February 2006, Discovery's licensing representatives abruptly interrupted a meeting with ODM and insisted that Discovery representatives end the meeting with ODM. (*See id.* ¶ 93.) Conspicuously missing, however, is whether Discovery actually breached the contract with ODM. ODM merely alleges that "On information and belief, OCC's threats constituted willful interference with ODM's contract with Discovery, causing a loss of an existing relationship and prospective economic advantage." (*See id.* ¶ 95.) At present, ODM's allegations are deficient as a matter of law because they leave open the possibility that Discovery lawfully terminated the contract or that the contract was terminable at will. *See, e.g.*, *Italverde Trading, Inc. v. Four Bills of Lading Numbered LRNNN 120950*, No. 04-CV-2793, 2007 WL 1094158, at *13 (E.D.N.Y. April 10, 2007) ("there is no question that Plaintiffs are required to establish that a contract was breached in order to prevail on this claim.") (citing *NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc.*, 87 N.Y.2d 614, 641 N.Y.S.2d 581, 664 N.E.2d 492 (1996); *Jack L. Inselman & Co. v. FNB Fin. Co.*, 41 N.Y.2d 1078, 396 N.Y.S.2d 347, 364 N.E.2d 1119 (1977)). Although this failure of pleading may only be an oversight by counsel, the claim cannot proceed as drafted. Accordingly, Count Fourteen is dismissed with leave to amend to include the allegation that Discovery breached the licensing agreement with ODM as a result of

OCC's interference.[24]

## CONCLUSION

For the foregoing reasons, the motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6) filed by Orange County Choppers ("OCC"), Vending Supply, Inc. ("VSI") and Interbrand LCC is granted in part and denied in part. Specifically, the motion to dismiss is denied as to Counts One, Two, Three, Ten and Thirteen; and granted as to Counts Four, Five, Six, Eight, Nine and Twelve. The motion is denied as to Count Eleven insofar as it relates to the allegations regarding (a) OCC's distribution of the designs without ODM's permission and (b) the overpayment of royalties. The motion is granted as to Count Fourteen with leave to amend within 21 days of the date of this Order.

SO ORDERED.
Dated:  White Plains, NY
      July 27, 2007

                                                           _William C. Conner_
                                          Senior United States District Judge

---

[24] If, in fact, Discovery did not breach the contract and ODM is able to plead in good faith a claim for tortious interference with prospective economic advantage, it may amend its Counterclaims accordingly.

31